James D. Hopkins, J.
Stephen David G-umley, aged 12 years, is the subject of this habeas corpus proceeding brought by the relator, his mother. The respondent is his father, with whom Stephen now resides. The marital history of the parties is rather involved.
*185 The relator first married the respondent on December 21, 1947, when she was 16 years of age. Stephen was born on March 16,1949. On November 13, 1950 the parties entered into a separation agreement, by the terms of which the sole and exclusive custody of Stephen was given to the relator; when the respondent obtained a divorce from the petitioner on February 28, 1951 in Arkansas, the terms of that separation agreement were incorporated in the decree.
The parties remarried on September 7, 1951. Again differences arose, and they executed a separation agreement on August 30, 1954. That separation agreement vested custody of Stephen in the relator; and when the respondent again obtained a divorce in Mexico on July 19, 1956, the terms of the second separation agreement were incorporated in the decree.
Stephen resided with the relator until May, 1960, when he went to live with the respondent. In the meantime the respondent had remarried on January 22,1958; his present wife has two children, aged 15 and 12, by a former marriage. Later, on August 9, 1960, the relator married her present husband, and now resides in Washington, D. C.
Stephen had lived with the relator and her parents from 1954 to May, 1960; his maternal grandparent died in July, 1956. He first attended public school in September, 1954. There he progressed so well that he was advanced from the second to the fourth grade in 1957. In September, 1958 he continued his education at Columbia Grammar School, entering on a partial scholarship. The records of Columbia Grammar School disclose that he is a highly intelligent boy who did not perform to the limit of his ability, though achieving creditable grades. He presented a behavior problem, which did not grow to serious proportions until January, 1960. At that time the principal of the school drew his misbehavior to the attention of the relator and the respondent, threatening to suspend him unless he received therapeutic treatment by a psychologist. Thereafter Stephen was sent to Dr. Oscar Sternbach, a psychologist, who saw him during the Winter and Spring of 1960, as well as both the relator and respondent.
Dr. Sternbach found that Stephen was suffering from a character disorder: that he was extremely self-centered, infantile, restless, and inclined to anxiety and depressiveness. Dr. Sternbach recommended in May, 1960 that Stephen live with his father, and the parties agreed. At that time the relator was contemplating marriage to her present husband, and her plans were unsettled. In June, 1960 the treatments by Dr. Sternbach were discontinued, and Stephen attended Summer *186 camp. In the Fall of 1960 Stephen entered the Ossining public school system, where he has been a student ever since. He did not, however, resume therapy with Dr. Sternbach, until January, 1961. The reason for the resumption of therapy was said by the respondent to be that Stephen again displayed behavior problems both at school and at home. Stephen has undergone treatment until the present time, save for suspension during the Summer.
This proceeding was precipitated by the events of the Summer. Stephen again attended camp; in August he spent several Weeks with the relator, who had leased a cottage at Westhampton Beach. In late August the relator told the respondent that she Avanted Stephen’s school records because she intended to take him with her to Washington. On August 29, 1961 Stephen left early in the morning to play tennis; the respondent later in the morning called the relator on the telephone to inform her that Stephen was with him, and would not return.
The relator urges that under the terms of the separation agreements and court decrees she is entitled to the custody of her son; that her agreement to allow Stephen to live with his father was temporary, pending only the time when the plans for permanent residence of her present husband and herself had hardened; that now she has a home in Washington where he may be accommodated; and that his schooling and therapy may as advantageously be continued at Washington as they are now afforded in New York.
No more difficult task confronts a court than the determination of custody of a minor. The competing interests of the parents pose a perplexing maze of fact, more often than not obscured by the deep emotional responses of child and parents alike. Sometimes the child appears to be a pawn in a power game between the parents; sometimes the child appears to manipulate the parents one against the other in order to accomplish his own desires.
The law wisely treats the rights of each parent equally. (Domestic Relations Law, § 70.) It uses as its touchstone the well-being of the child rather than the rights of the parents (Matter of Bachman v. Mejias, 1 N Y 2d 575, 581; Finlay v. Finlay, 240 N. Y. 429). The stipulations of the parents in written agreements and the directions of foreign decrees both yield to the paramount consideration of the child’s welfare, if it is found that such stipulations and directions are contrary to the indicated interests of the child (Matter of Hicks v. Bridges, 2 A D 2d 335; People ex rel. Pritchett v. Pritchett, 1 A D 2d 1009, affd. 2 N Y 2d 947).
*187 There is no showing in this case that either the relator or the respondent is unfit or unworthy to be the custodian of Stephen, though intimations to that effect have been drawn by each parent against the other. Both appear to be capable of caring for Stephen both financially, socially, and affectionately. There is no occasion at this time for the making of invidious comparisons between the two, nor to discover which of them contributed more heavily to Stephen’s difficulties; doubtless the seeds Were implanted and nourished when the breach in the marriage bonds eventually led to the final dissolution. The controlling factor in this case rather lies in the emotional disturbance of Stephen now and for some time past under treatment. That this is a serious matter is quite clearly evinced by the testimony of Mrs. Buchan, the principal of Columbia Grammar School, Dr, Sternbach, the treating psychologist, and Messrs. Katz and Covert, respectively the camp director and teacher of Stephen during the past year. Dr. Sternbach testified that Stephen’s disorder has shown improvement, but that in his opinion therapy should continue for the next two years. In Dr. Sternbach’s opinion no change in Stephen’s residence should occur at least until the end of the present school year.
I accordingly find that the best interests of Stephen will be served by directing that his custody remain with the respondent during the balance of the present school year. I find that an interruption of his studies at Ossining Junior High School and of his therapy with Dr. Sternbach would be detrimental to his welfare. I do not* however* intend that this determination be final: it is consistent with Stephen’s well-being that it be reviewed at the end of the school year. At that time, based on Dr. Sternbach’s evaluation of Stephen’s emotional condition, his performance at school and his outlook for the future, a further determination should be made, In the meantime broad visitation rights should be accorded to the relator. If the parties cannot agree on the scope of these visitation rights, I shall entertain their suggestions upon the Settlement of the order.